## In Re: Appeal of A.A.R.F., Inc.

*Ronald C. Stanko,* for appellant.

*William T. Malone,* for the Pennsylvania Liquor Control Board.

ESHELMAN, *J.,* April 9, 1984—This matter is before the court on an appeal from a decision of the Pennsylvania Liquor Control Board (hereinafter the board) refusing appellant a new restaurant liquor license on the basis of a resort area application. After hearing the case de novo, we make the following:

## FINDINGS OF FACT

1. On January 20, 1982, appellant, A.A.R.F., trading as the Racquet Club, made application to the board for a new restaurant liquor license for the premises located at Love Road, Green Hills, Reading, Berks County, Pa.

2. On July 21, 1982, a hearing on appellant's application was conducted before the board's hearing examiner in Allentown, Pa.

3. An opinion and order were issued by the board on September 27, 1982, in which the board made the following findings:

> 2. The board is not satisfied that the establishment proposed to be licensed is located in a resort area.

> 3. It has not been established that there is a necessity for an additional restaurant liquor license in Cumru Township, Berks County.

4. Said order of the board refused appellant's application for the above-mentioned license.

5. A timely appeal was taken to this court on October 15, 1982.

6. On December 27, 1982, a de novo hearing was held before this court at which time counsel agreed to the admission into evidence of certified copies of:

(a) the transcript of the July 21, 1982 hearing

(b) the board investigation report

(c) the application, opinion and appeal notification (Ex. 3)

Additional evidence was also received.

7. A.A.R.F. is a Pennsylvania corporation, with its principal place of business at Love Road, Green Hills, Reading, Berks County, Pa.

8. The proposed premises is located approximately one-quarter mile from Route 10 and one-half

mile from the entrance to the ramp of Interstate 176.

9. Both Route 10 and Interstate 176 are major traffic routes which connect with the Pennsylvania Turnpike Exit 22 Morgantown.

10. Route 10 and Interstate 176 are major traffic corridors to the Reading outlets.

11. The premises to be licensed is contained on the first floor of a two-story masonry and steel building. The remainder of the building is utilized as a racquet ball and fitness center.

12. The proposed license would cover a bar-dining room, 29' x 23'; a dining room, 17' x 44'; and a kitchen, 11' x 23' with an eating capacity of 100 to 120 people. The premises is not presently operating as a bona fide restaurant.

13. The Racquet Club currently has a 60 car parking facility. Appellant proposed an extension of the lot to accommodate an additional 30 to 60 cars.

14. The proposed facility would be open seven days a week, from 6 a.m. to 2 a.m., serving breakfast, lunch and dinner with a take-out service. It would be geared towards casual dining.

15. Cumru Township has a quota of five licenses for the retail sale of alcoholic beverages. There are eight restaurant liquor licenses counted against the quota. There are also four club licenses and one hotel license in effect which are not counted against the quota.

16. In the city and metropolitan area of Reading there exist four major outlet centers: Vanity Fair Complex, Wyomissing; Great Factory Store, Reading; Big Mill Outlet, Reading; and Reading Outlet Center, Reading. There exist over 1,250,000 square feet of outlet rental space in the four outlet centers combined. The outlets constitute a major tourist attraction for the metropolitan area of Reading.

17. The proposed premises is located within five miles of the four outlet centers.

18. Eighty-five percent of the visitors to the outlets are from outside the Reading-Berks County area.

19. Approximately 1,200,000 vehicles exit the Pennsylvania Turnpike at Morgantown per year emanating from a 250-mile radius. In addition, in a given year well over 6,000 buses come to the outlets from outside the area.

20. Outlet shoppers who exit the Pennsylvania Turnpike at Morgantown will necessarily travel Route 10 or Interstate 176 to get to Reading.

21. The proposed licensed premises is accessible from Route 10 and Interstate 176.

22. The daily traffic count at Route 10 and Pheasant Road, near the Racquet Club, in the peak morning hours is 1,086 vehicles per hour. The peak afternoon hour counts 1,308 vehicles per hour. The average is derived from daily traffic, not traffic during the pre-Christmas or summer seasons.

23. The outlet centers in the Reading Metropolitan area constitute what is known as the Outlet Industry.

24. The Reading Outlet Industry is seasonal in nature, with a major influx of transients into the area during the months of August, October, November, March and April.

25. Automobiles parked at the Reading Outlet Center bear license plates from all over the country.

26. The Reading Outlet Center is a member of the National Tour Brokers Association, the American Bus Association, and the Pennsylvania Dutch Travel Association.

27. The outlet centers are a tourist industry in Reading and Berks County.

28. The tourist population visiting the outlet centers in Wyomissing and Reading are casually dresssed shoppers who usually come for day trips.

29. Approximately 100,000 people come into the area via buses and cars, specifically for the outlet stores on a normal weekend.

30. Within a six-mile radius of the Racquet Club there are 80 private parks and recreational areas, 30 public parks and recreational areas, 20 historically certified structures, and on the tip of the radius are state and federal public parks such as Hopewell and Blue Marsh.

31. Blue Marsh Dam and Recreation Area is a federal project. Attendance at the Blue Marsh Lake for a six month period in 1982 totaled 532,135. This figure was obtained from six metered areas at Blue Marsh: the Day Use Area, Visitor Center, Dry Brooks Boat Launch, Stilling Basin, State Hill Boat Launch, and Sheidy Road Boat Launch. The figure does not include "back areas" of the lake which are impossible to meter.

32. The distance from the Racquet Club to Blue Marsh is approximately six miles.

33. None of the restaurants located along Route 10 within a four to five mile radius of the Racquet Club can satisfy the requirements of the tourist population in a manner comparable to the Racquet Club.

34. There are six eating establishments located along Route 10, four of which have liquor licenses. The Post Office, the Woods Pub, the Alpenhof and Green Hills Inn possess liquor licenses; Club 19 and Szechuan are unlicensed restaurants.

35. The Post Office restaurant is located on Route 10. It provides formal dining, serving gourmet foods, French cuisine with limited hours of operation and limited seating capacity.

36. The Woods Pub provides casual dining with male or female go-go dancers as amusement. The Woods Pub does not provide a family dining atmosphere.

37. The Green Hills Inn provides formal dining, serving French cuisine. The hours of operation are limited as is the seating capacity.

38. The Alpenhof serves a German cuisine with limited hours of operation and seating capacity.

39. The Szechuan is an unlicensed Chinese restaurant with a Chinese provincial menu.

40. Club 19 is located within the Flying Hills residential community and does not possess a restaurant liquor license.

41. No establishment in this area is open for operation from 6 a.m. to 2 a.m., serving breakfast, lunch and dinner as the Racquet Club will be.

42. The type of establishment and the hours of operation of the proposed licensed facility would not be competitive with, and in fact, would offer services not currently available in Cumru Township.

43. The existing licensed establishments do not lend themselves to the needs of tourist population attracted to the outlet centers, the Blue Marsh recreational area and other tourist attractions. The existing facilities are geared towards a formal clientele, whereas the transients who visit the area need a facility which will cater to a casual crowd.

44. There presently exists in Cumru Township a need for an establishment located on the tourist route and available to the large number of people visiting the Reading outlets and the Blue Marsh area on a seasonal basis which would hold a liquor license issued by the board to serve food and beverages.

45. Establishments in the area are incapable of serving the number of people who frequent the area for business purposes on a regular basis.

46. Within the general vicinity of the Racquet Club there are four major business firms that employ a substantial number of people. Gilbert Associates has a work force of approximately 3,000. Reliable Electric Company has a work force in excess of 25 people. Berk-Tech employs over 100 people. Crompton and Knowles has a work force of 200 people.

47. The existing establishments can not adequately serve the number of people in the area on a regular basis. It is evident that they are unable to accommodate the vast number of tourists who frequent the area in peak seasons.

## DISCUSSION

Appellant in this case is appealing the denial by the board of a new restaurant liquor license on the basis of a resort area application.[1] This court held a hearing de novo on the matter and received additional evidence. The scope of review by this court is limited to ascertaining whether there was a clear abuse of discretion on the part of the board.

"The court may not substitute its own discretion for that of the liquor control board and may reverse only if the board commits clear abuse of discretion or when facts elicited de novo are different from those found by board."

Application of Hohl, 20 Pa. Comm. 490, 493, 342 A.2d (1975). This court finds the board abused its discretion when it found that the proposed facility was not located in a resort area and, in addition, that

---

1. 47 P.S.C.A. §34-461(b).

appellant failed to show the requisite necessity for an additional liquor license in Cumru Township.

Section 461(b) of the Liquor Code, Act of April 12, 1951, P.L. 90, Art. IV as amended, 47 P.S. §34-461(b) provides the board with the power, in its discretion, to increase the number of liquor licenses in a municipality upon a resort application. The above section provides:

"the board shall have the power to increase the number of licenses in any such municipality which in the opinion of the board is located in a resort area."

The Liquor Code does not define what constitutes a resort area. However, there is a substantial amount of case law in existence on point.[2]

The Commonwealth Court in In Re Appeal of Brandywine Valley Inn, Inc., 53 Pa. Commw. 203, 417 A.2d 823, 826 (1980) stated very succinctly that:

"a resort area is characterized by the population increase in the geographical area surrounding the premises during certain seasons such that the usual number of liquor licenses within that geographical area is not adequate to serve the needs of the people."

In order to establish that a particular municipality is located within a resort area one must present specific evidence regarding the size and number of recreational facilities in and around the municipality

---

2. Pennsylvania Liquor Control Board v. Roberts, 79 Pa. Commw., 368, 468 A.2d 1140 (1984).

In Re Application of El Rancho Grande, Inc., 78 Pa. Commw., 592, 467 A.2d 1381 (1983).

In Re Application of East Course, Inc., 60 Pa. Commw. 83, 430 A.2d 1029 (1981).

In Re Appeal of Brandywine Valley Inn, Inc., 53 Pa. Commw., 203, 417 A.2d 828 (1980).

and their proximity to applicant's place of business. In addition, one must present evidence of the seasons during which the facilities are used and the number of individuals utilizing them.[3] When considering the question of proximity of recreational facilities to the proposed licensed premises, one must keep in mind the fact that "in today's mobile society a distance of four to seven miles is not so remote as to be excluded from the immediate area of applicant's premises."[4]

In addition to establishing an area to be a resort area, the applicant must also show that there exists a need in the area for another liquor license.[5] The factors to be considered on the issue of necessity are:

". . . the needs of the persons who will use the facility and the number and types of establishments already present in the area. . . . whether the clientele to be served is different from that served by the existing licenses. . . .the real question is whether the applicant can add a service where and when the present license can not."

In Re Brandywine supra at 826.

Therefore, the burden on the applicant is twofold; he must show: (1) that the proposed licensed premises is located in a resort area and (2) that there is an actual need for another license in the area.

## RESORT AREA

Testimony and evidence presented to the court supports a finding that the proposed premises is lo-

---

3. In Re Aiello, 41 Pa. Commw. 345 , 399 A.2d 154 (1979).

4. In Re Brandywine, supra at 826.

5. James v. Pennsylvania Liquor Control Board, 43 Pa. Commw. 165, 402 A.2d 1093 (1979).

In Re Brandywine, supra.

cated in a resort area.[6] Appellant presented evidence on the impact of Blue Marsh, the outlet phenomenon, parks, recreational facilities and historical structures located within a six-mile radius of the proposed facility.

Blue Marsh is located approximately six miles from the Racquet Club. It is a federal project with over 5,500 acres, 1,500 of which are devoted to recreational facilities. The facilities offered for public use are boating, camping (tents), fishing, hunting, picnic areas and swimming.[7] In 1981, Blue Marsh's first year of operation, approximately 1,000,000 people visited the park. In the first six months of 1982, 532,135 people utilized the facility. The above figures were obtained from six metered areas at the Lake, not including entrances from back areas of the lake which can not be metered. The fact that the Blue Marsh project attracts a large number of transient individuals to its facilities, especially during the hunting and summer seasons, coupled with the fact that the 1980 Census count for Cumru Township was 11,474, leads the court to conclude that many of the visitors to Blue Marsh are from outside the immediate area.

The Commonwealth Court in In Re Brandywine Valley Inn, Inc., found that a recreational facility situated four to seven miles from a proposed premises was located within the immediate area of that premises and granted a liquor license to the applicant. Therefore, the Blue Marsh project located within seven miles of applicant's premises is found to be situated within the immediate area of the Racquet

---

6. See N.T. at 6-9, hearing of December 27, 1982.

7. See hearing of July 21, 1982, Ex. 3. Berks County Open Space and Recreation Plan Revision.

Club and thus contributes to the classification of the area as a resort area.

Within a six-mile radius of the Racquet Club there exist 80 private parks, 30 public parks and 20 historically certified structures which also draw a substantial number of tourists to the area.[8]

The testimony presented regarding the outlet phenomenon in Reading, Berks County, establishes that a tremendous influx of shoppers visit the outlets. Although tourists shop the outlets throughout the year, evidence was presented which illustrates the seasonal nature of the outlet industry.[9] The preschool, Christmas and Easter seasons encompass peak periods for the outlet industry. The months of August, October, November, March and April are accompanied by a large influx of shoppers to the outlet centers.

There are four outlet centers in and around Reading, three within the city itself and one in Wyomissing. In combination, they offer over 1,250,000 square feet of rental space. All four outlets are accessible from Exit 22 of the Pennsylvania Turnpike via Route 10 or Interstate 176 and are located within five miles of the proposed establishment. In a normal weekend the outlets are visited by approximately 100,000 people. In a given year, well over 6,000 buses transport shoppers from outside the Berks County area to the outlet centers. It is an established fact that 85 percent of the outlet shoppers originate from areas other than Berks County. Thus, it is clear that the outlet centers constitute a distinct tourist attraction, especially during late summer, Christmas and Easter months, bring-

---

8. See Ex. 1 at 14; supra at footnote 7.
9. N.T. at 11, hearing of December 27, 1982.

ing to the area a large number of transient individuals from all over the country.[10]

This court finds that appellant has carried his burden of showing that the proposed premises is located in a resort area.[11] Appellant has presented evidence regarding the number and size of recreational facilities in the area, their proximity to the proposed facility, the seasons during which the facilities are primarily utilized and the number of transients who use the facilities.[12]

## NECESSITY

Testimony presented on the issue of necessity has enabled this court to find that a need exists in

10. See N.T. at 9, 12; hearing December 27, 1982.

11. The Commonwealth Court has found '. . . the unavailability of lodgings relevant in many cases because it reflects on whether the users of the proferred resort attractions and the applicant entity were or were not predominately residents of the subject area. However, the statute itself does not call for an overnight influx, and the cases have not held the presence or absence of lodging per se determinative. We see no need for such evidence if the record otherwise demonstrates that "the area's facilities are used primarily by the temporary transients or tourists and not by area residents." In Re Appeal of Brandywine Valley Inn, Inc., 53 Pa. Commw. 203, 207, 417 A.2d 832, 826 (1980).' In Re Application of East Course, Inc., 60 Pa. Commw. 83, 430 A.2d 1029, 1031 (1981). In light of the fact that the record in this matter demonstrates that the area facilities are used primarily by temporary transients and not area residents, this court did not address itself to the availability of overnight accommodations.

12. Pennsylvania Liquor Control Board v. Roberts, 79 Pa. Commw. 368, 468 A.2d 1140 (1983).

In Re Application of El Rancho Grande, Inc., 78 Pa. Commw. 592, 467 A.2d 1381 (1983).

Pennsylvania Liquor Control Board v. Remley, ____ Pa. Commw. ____, 436 A.2d 1250 (1981).

Aeillo, supra.

Cumru Township for an additional restaurant liquor license due to the inability of the existing establishments to accommodate the needs of the transient population which frequents the area during peak seasons. There are 13 eating establishments licensed to dispense liquor in Cumru Township, of which Woods Pub, Alpenhof and Green Hills Inn are located within five miles of the proposed premises. In addition, there is the Post Office restaurant which is situated in Robeson Township not five miles from applicant's premises. Three of the four restaurants listed above provide formal dining; serving French or German cuisine, with limited seating capacity and hours of operation. The Woods Pub, on the other hand, offers a casual atmosphere but is not conducive to family dining as it provides male or female go-go dancers as entertainment. There are also two unlicensed restaurants in the area, the Szechuan and Club 19.

Evidence presented illustrated that the existing facilities are unable to accommodate the business community in the area on a daily basis. Testimony was received which indicated the virtual impossibility of securing luncheon reservations at the restaurants in the immediate area of applicant's proposed facility.

The large number of tourists who frequent the Reading outlet centers and surrounding areas are usually dressed in casual attire and seek an eating establishment which is open from early in the morning to late at night, offers a full menu (breakfast, lunch and dinner) at reasonable prices and provides a casual dining atmosphere. Many of those who come to the area to shop are on day trips and are not interested in formal dining, nor do they have the time to make reservations at any of the existing

facilities. Furthermore, it is very unlikely that any of the restaurants which do require reservations in advance would be able to accommodate a bus load of tourists in addition to their regular clientele.

In light of the inability of the existing licenses to accommodate the needs of their clientele on a daily basis, coupled with the type of services they offer, this court finds that they are unable to meet the needs of a transient clientele such as the outlet shoppers or patrons of Blue Marsh.

Evidence was also presented to the court regarding the type of establishment and the services to be offered by the applicant, and the court finds the Racquet Club would offer services not currently available in Cumru Township. The Racquet Club would operate seven days a week, from 6 a.m. to 2 a.m., serving breakfast, lunch and dinner, with a take-out service and provide dining in a casual atmosphere. This type of facility would be ideal for the tourist element which comes to Cumru Township in that it offers a casual atmosphere with the benefits of a full menu. It is clear that applicant's proposed facility would serve a clientele different and apart from that served by the existing eating establishments and in doing so provide a badly needed service in the area.

## CONCLUSIONS OF LAW

(1) The evidence presented establishes that the proposed licensed facility is located in a resort area and that there exists a need in the area for an additional liquor license.

(2) The Board's refusal of appellant's application for a new restaurant liquor license on the basis of a resort area application was improper.

## ORDER

And now, this April 9, 1984, it is ordered that the Pennsylvania Liquor Control Board grant appellant A.A.R.F. a new restaurant liquor license on the basis of a resort area application.